JAMES M'CONAHY *against* The CENTRE and KISHACO-QUILLAS TURNPIKE ROAD COMPANY.

Satisfactory proof of the loss of a written advertisement must be given, to lay a ground for the admission of the advertisement copied into the newspaper.

A charter of incorporation cannot be declared void in a collateral suit, it can only be vacated by a *scire facias* to repeal it; or on a writ of *quo warranto,* at the suit of the commonwealth.

An agreement between commissioners authorised to take subscriptions of stock, that a certain number of shares of fictitious stock shall be subscribed, in order to enable them to obtain a charter, is a fraud upon the *bona fide* subscribers, which will relieve them from any obligation to pay.

A declaration made by a third person, in the presence of the commissioner, to one about to subscribe for stock, that he can pay his subscription in work, and this not objected to at the time by the commissioners, must be taken as his declaration; and there is no distinction between the commissioner and the corporation, in regard to this promise.

Writ of error to the special Court of Common Pleas of Mifflin county.

This suit was brought by the *President, Managers and Company of the Centre and Kishacoquillas Turnpike Road Company* v. James

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

*M'Conahy,* to recover the amount of stock in said company subscribed by him, and which had been called in by resolutions of the said company.

The whole case appears so fully in the opinion of the court, that any other statement is unnecessary.

*Fisher* and *Blanchard,* for plaintiff in error.

*Wilson* and *Potter,* for defendants in error.

The opinion of the court was delivered by

SMITH, J.—This case again comes before this court for decision, and I regret that we are a second time under the necessity of reversing the judgment of the court of Common Pleas. It was an action of *assumpsit,* brought by the defendants in error, against the plaintiff in error, the defendant below, for the amount of his subscription of five shares of fifty dollars each, to the stock of the Centre and Kishacoquillas turnpike road company. On the trial of the cause, after the plaintiffs below, had given some evidence in support of their action, they offered in evidence *a newspaper,* called the "Juniata Gazette," of the 20th of November, 1821, in which there was an advertisement, purporting to have been signed by the defendant, with six others, calling a meeting of the stockholders, to hold an election for officers to organize the company, for the purpose of showing that *James M'Conahy* had accepted the charter, and had acted under it. To the reading of this paper, the defendant objected; the plaintiffs then called *William Mitchell,* who proved, that he had printed the paper, and had regularly issued it; that it was not his custom to preserve original advertisements, and that he never did preserve them: that he had told the defendant he had not the original, nor any papers among which he could look with any hope of finding it, that he thought the old papers of the office were destroyed among waste paper, shortly after the publication; and that some of the advertisements he had taken from the Bellefonte paper; but could not say as to this, nor that it was, or was not, copied from the last mentioned paper: that if he copied it from a written paper, it was either destroyed or lost, but that he had not *hunted* for it, as he had no place he could look with any prospect of finding it. He also proved, that the defendant was one of his subscribers, and took his paper at the time. The defendant, however, still objected to the reading of the paper, alleging there was no proof, that the defendant had signed it, or authorised it to be printed, or knew any thing of the transaction, that the original should have been produced, or its loss proved; and that the seven first commissioners should have given the notice, not the seven first subscribers. The court overruled the objections, and admitted the newspaper in evidence. An exception was taken to this opinion of the court, which forms the first error complained of.

55

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

The question was, whether *James M'Conahy* had signed the advertisement, or authorised its publication. If it had merely been, whether he had notice of a fact published in the newspaper, the fact of his taking the paper, in which it was published, might have been submitted to the jury; but, I take it, that in this case, the original paper, signed by the person, ought to have been produced, or *its loss proved*, and if its loss had been legally proved, then proof that the defendant had *signed* it, or proof, that he *knew* of it, and had agreed, that some other person should write the advertisement and put his name to it, would have been sufficient. But the evidence did not prove the fact, that the defendant had advertised, or sanctioned the advertisement; indeed, there was no legal evidence to show, that due diligence had been used to procure the original, or to account satisfactorily for the want of it, in truth, the witness said he had not looked for it, as he had no prospect of finding it. This was not a sufficient reason to supercede the necessity of a search, and a diligent search might have been successful. The defendant moreover was not one of the commissioners, he was only a subscriber, and as such was not entitled to advertise; the commissioners alone were directed to perform this duty. See *Pamp. Laws of* 1821, *page* 75, and *Pamph. Laws of* 1826, *page* 349. We therefore think that the admission of the newspaper was wrong. The decision in the case of *Sweigart* v. *Reisinger's Administrator,* 14 *Serg. & Rawle,* 203, on a similar point, goes far to determine this part of the case.

After the plaintiffs had read the advertisement to the jury, they gave further evidence to prove, that the defendant had constituted a proxy to vote at the first election of the company for officers; they also proved the amount of the cost of the road, and its annual toll, and then rested their cause.

The court permitted the plaintiffs to prove by one of the commissioners, that he saw the defendant sign for his five shares, at Mr. *Reynolds'* tavern, that the commissioners had obtained all the stock they could, after the act of 1821, called the general appropriation act, had passed, giving this road twenty thousand dollars. This witness also proved, that he had calculated the probable expense of the road, and was satisfied, that they had a sufficient sum subscribed, taking in the twenty thousand dollars from the State, or perhaps more; that thereupon the commissioners met at *Kerr's,* at which meeting, all or nearly all were present, and the calculation laid before the commissioners, and they were all of opinion, that *no more stock* could be obtained, but that with the State stock, they would have enough: that it was debated, whether they should get the amount of individual stock reduced, or get the amount required by the act, by adding *fictitious* stock, *so as to obtain the charter,* and enable the company to go on. The commissioner then filled up the certificate, or in part signed it in blank, when the other commis-

(James M'Conahy *v.* The Centre and Kisacoquillas Turnpike Road Co.)

sioners took it, and were to get it completed, and this was the last act the witness did, in relation to the company, except paying stock. The witness also proved, that he saw a subscription of the board in a book of fictitious stock, and that the first suggestion of taking fictitious stock, was in Lewistown. There were from two hundred and ninety to three hundred shares of good stock, about half the amount required. The act of assembly required six hundred shares, before a charter could be obtained. The witness declared they were right in their estimate; for the good shares were amply sufficient, with the twenty thousand dollars to make the road. He could not say, that he ever told the defendant that three hundred shares would be enough, but he often had repeated the declaration. On his cross examination, the witness said, " there was no other commissioner but myself present," (when Mr. *Reynolds* took pains with Mr. *M'Conahy* to induce him to subscribe,): " he took more pains with him, than I did; I put him more particularly under his care."

The defendant also proved, by another witness, that while he was taking stock in 1821, with the commissioner, he was anxious to have stock taken, and that he was requested to speak to the defendant for this purpose; that he did so, and took him into the room, in which the commissioner was; that the defendant refused to subscribe, and that then the witness urged as a means to induce the defendant to subscribe, that he could pay it in black smith work, that the defendant had before refused, alleging he was not able: that he prevailed on him to subscribe, he believed by holding out the inducement of paying in work; his treaty with the defendant was in the presence of the commissioner, who, however, did not say any thing, and was not appealed to. Being cross examined, the witness could not remember the manner he had pointed out, of the defendant's getting the work, but that he had referred to his labour, as a means of getting money to pay, and said it would be their interest to collect in work, that there was no stipulation by the commissioner, that the company would take work; the matter was principally left to the witness.

This closed the testimony on both sides, when the following points were submitted to the court by the parties, to wit, the plaintiffs requested the court to instruct the jury:

" 1st. If the jury believe that the defendant advertised, as one of the first seven stockholders named in the charter, for an election, signed a proxy and voted at the election by proxy, on the 3d of December, 1821, it would be conclusive evidence, in point of law, of his acceptance of the charter, and the plaintiffs would be entitled to recover.

" 2d. That the act of the 10th of April, 1826, and of the 1st of April, 1823, *validates* the subscription of the defendant, and *places*

(James·M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

him in the same situation as if no fictitious stock had been obtained.

" 3d. That even if the stockholders would take advantage of the fictitious stock, yet the defendant by his acts of voting by proxy, advertising, &c. cannot now set it up as a defence in this suit."

The defendant requested the court to instruct the jury:

" 1st. That if they believe *M'Conahy,* the defendant, did not know that fictitious stock had been certified to the governor, when he gave his proxy to *James Milliken,* then that proxy cannot affect the defendant.

" 2d. If the jury believe, that the advertisement, for the election for managers, of the first seven subscribers, was done without the agency of *James M'Conahy,* the defendant, but by other persons using his name, then this advertisement cannot in any way affect him.

" 3d. If *James M'Conahy* was induced to subscribe five shares of stock, for which this suit was brought, under the promise of paying in black-smith work and other work, the plaintiffs should have made a demand of this work before they could sustain this suit.

"4th. That if the jury believe, at the time *M'Conahy* subscribed his five shares, and at the time the advertisement for the election, and at the time he gave his proxy to *Milliken,* he was ignorant that fictitious stock was certified to the governor, the plaintiffs are not entitled to recover."

These points were generally answered by the court in their charge to the jury, which was as follows, to wit:

" It appears to me, that the three following questions are presented in the investigation of this cause.

" 1. Was the charter accepted and confirmed by defendant, if so, he cannot now gainsay it.

" 2. If not accepted or confirmed by defendant, was the admission of the fictitious signers of stock, by the commissioners, a fraud upon the defendant.

"3. Was the subscription of *M'Conahy* obtained through fraudulent representations, sanctioned by the agent of the company?

" By the act of 1821, for the erection of this company, Mr. *Burnside* and others, were appointed commissioners to receive subscriptions, so as to enable the subscribers for stock, to obtain a charter of incorporation. The leading public object was to have a turnpike road made from Brown's mills to Bellefonte. It may have been a private object with the subscribers to vest their money in a fund that, besides contributing to the completion of the road, might furnish them an annual interest. The commissioners were as well agents for the public, as for the subscribers. It was, therefore, a duty imposed by interest on the subscribers, to attend to the transactions of the commissioners. The act of assembly was directory upon the commissioners, and they had no legal ability to do any

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

thing contrary to the provisions of the act. No charter could have been demanded until all the provisions of the act were complied with; and the subscribers could not be prejudiced by any act of the commissioners, contrary to law. The charter was to be procured *from the government*, for the benefit of *the subscribers*, not for the benefit of the commissioners. If *the subscribers* procured their charter without an exact compliance with the provisions of the law, it was not for those who procured it to complain. The government from whom it was obtained might or might not repeal it at their pleasure. So long as the charter exists unrepealed, and more particularly since the original defects have been expressly waived by the government, by a positive act of assembly, *it exists legally*, and is *of full force and effect* according to its import. The company has a legal right to sustain a suit in their corporate name, and upon the trial, now in progress, on the pleas and issues upon the record, the validity of the charter cannot be enquired into. The court and jury are bound to give effect to the contracts of the corporation, and *to the contracts in subscribing* for stock, made before the date of the charter, so far as such contracts were *fair* and *honest*, and did not fraudulently affect the interests of such subscribers. If the commissioners did any act contrary to their legal duty, after *James M'Conahy* subscribed for five shares of stock, without his knowledge or assent, to his prejudice, it would avoid the obligation of his engagement to pay. Two acts are complained of by the defendant as having this effect. First: It is complained that instead of obtaining the subscription of six hundred shares, before a charter was obtained, only three hundred good shares were obtained; and in this way it said the defendant was prejudiced. If *M'Conahy* had no knowledge of such fact, and he never assented to it directly or indirectly, and it was in prejudice of his rights, his subscription was not binding upon him. But supposing him to be wholly ignorant of the facts in relation to the fictitious stock, and the fact of the charter being obtained upon it, was he prejudiced by it? It is as well a presumption of the law, as the testimony in the case—that it was supposed that the full amount of the *bona fide* subscriptions, together with the State money, would be required to complete the road. And from the terms of the subscription, it was indicated that the subscribers were bound to pay fifty dollars on each share by them respectively subscribed. There were two objects the subscribers probably had in view; one the completion of the turnpike road, the other the vesting of their money in a productive fund. From the testimony it appears that the first object has been fully effected, for the road has been long since made, and the company been in the receipt of tolls for the whole distance. The second object may have been *advanced* rather than *injured* by the contrivance of certifying the fictitious subscriptions. Because if six hundred shares had been subscribed at fifty dollars a share,

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

added to the State stock of twenty thousand dollars, it would have amounted to fifty thousand dollars; while three hundred shares at fifty dollars, with the State stock, amounted to thirty-five thousand dollars; if the whole money had been received and expended, as is generally the case, in the one event, the defendant would have drawn his dividend in the proportion his stock bore to fifty thousand dollars; in the other, in the proportion it bore to thirty-five thousand. It is left to the jury to say, whether under all the evidence, the facts in relation to the fictitious stock injuriously affected the engagement of the defendant under his subscription, without his knowledge or assent, directly or indirectly; if so, it would absolve him from his engagement. Where companies have plenty of money they generally spend it liberally; where they have little, it often induced economy. It can hardly be doubted that the principal and leading object of the subscribers was to effect the completion of the turnpike road contemplated. We have it in proof, that after earnest attention to the business, and every diligence used, the commissioners could only obtain about three hundred shares of stock to be subscribed, and the act of assembly requiring six hundred before a charter could be had, they were at a stand, they could not move a step further. The great object of the subscribers was likely to be defeated, and it was only by the expedient resorted to of filling up the list with the names of persons unable to pay, that the charter could be had, or the great work effected. Although as between the government and the subscribers, the expedient resorted to may have been exceptionable, it appears to me it was manifestly for the advantage of the subscribers; indeed it was the only way the commissioners could devise to effect the object at all. The subscribers accepted the charter so obtained; the company was organized, moneys collected, the road made, toll gates erected, and the company now in the receipt of tolls; and the government confirmed the charter, on their part waiving all objections on account of the irregularities alluded to. How, then, was the defendant injured in the affair? He subscribed for five shares. His subscription imports an unconditional obligation to pay the whole, if required. There is no condition precedent expressed in it, and the idea was not held out by the commissioner, as he stated in evidence, that less than the whole would be required. The road was sooner made, and it is said to be well made, and very probably made for less money, by the expedient resorted to, than if the whole six hundred shares had been subscribed by solvent stockholders. *I do not, therefore, see so plainly how the defendant was injured or exposed to injury in this transaction, and if he was not, I see no reason he has to complain.*

" But it is said he accepted the charter, advertised for the election of officers under the charter, and voted at the election by proxy. If he did accept the charter, knowing the facts alluded to,

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

his mouth would be closed, and no objection on that account could now avail him. See first point on part of the plaintiffs, and first point on part of the defendant. The advertisement and proxy are evidence to show his acceptance of the charter. But if in truth, he did not know that fictitious stock had been certified to the governor, when he gave his proxy to *James Milliken*, such proxy would not affect him. There is no legal magic in the proxy, it is only as evidence of the fact of acceptance of the charter. If he did so, knowing the facts, he is barred in his defence. If he did not know the facts, the proxy would have no effect. See second point of defendant. The same remarks apply to the advertisement. If it was done without the agency of defendant, by other persons using his name, it would not affect him. It seems it was not his duty to advertise, he was not therefore bound to know the facts in relation to it, any thing thus done in ignorance of a man's rights, or of the facts do not affect him.

" Fourth point of defendent. Such ignorance as is set out in this point, may not be a bar to plaintiff's recovering, if the charter was obtained, the company organized, the work done as intended, and the State has confirmed the charter, waiving all exceptions to these irregularities. If defendant was not injured or defrauded, he would have no right to resist the payment on that ground. See second point on part of the plaintiff. The two acts referred to, do validate the charter, and the subscriptions if *bona fide* made. But if fraudulently obtained on part of the commissioner, this act would not, and could not confirm them. If fraudulent in the beginning, no subsequent acquiescence of the defendant would make them good. It would require a new engagement, or something equivalent. The legislature never intended to give effect to a contract improperly obtained, contrary to the consent of the injured party. The terms of the act only apply to subscriptions, obtained *bona fide* in one act, and in good faith in the other, which is the same thing.

" Third point of plaintiff: If the giving the proxy, voting, advertisement, &c. satisfy the jury that the defendant knowingly accepted the charter, we before said, and now repeat, that his mouth would be closed, but if done without a knowledge of the facts he now complains of, or by others, without his knowledge, defendant would not be affected by it.

" Third point on part of defendant. The commissioner taking the stock, was the agent appointed by law for that purpose. If the defendant was induced to subscribe under a promise or engagement from him, that it should be paid in black-smith work, the plaintiffs should have made a demand of such work before they could sustain this suit. It was the duty of the commissioner to take subscriptions on the terms prescribed by law. Those terms are set out in the writing in the book over the subscriptions, it calls for

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

money, not for work, and the commissioner had no power or authority to promise or engage to take payment in work.  He might use fair reasoning and argument to induce such subscriptions, but could not use false inducements; but was only responsible for his own conduct in this particular.   If others falsely induced defendant to subscribe, if the commissioner had no hand in it, and did not assent to it, it was the defendant's folly, and ought not to avail him. *I would apprehend from the evidence, that no such fraud was practised on the defendant by the commissioner.*  But it is a fact to be determined by the jury.   Indeed the whole cause depends mainly on the evidence, was the defendant imposed upon, *was* the terms of the agreement altered to his prejudice, was he circumvented by the agent, was any fraud practiced upon him, if so, he stands discharged from the obligation of his engagement.  If he knew how the charter was obtained, and assented to it, and voted by proxy for officers under it, or if the fictitious stock was added and certified, even without his consent; if it did not defraud or injure his rights, and if he subscribed voluntarily the written engagement over his name, he is bound to pay.  Plaintiffs only claim *thirty* dollars a share with common interest."

To this charge, the defendant excepted, and has here assigned nine errors ; some of which have not, however, been insisted on in the argument.   The errors are,

1.   The court erred in receiving in evidence the newspaper, containing the printed advertisement, as set forth in the *first* bill of exceptions of defendant below.

2.  The court said, " was the charter accepted and confirmed by the defendant ?  If so, he cannot now gainsay it."

3.  The court said, " upon the trial now in progress, and the pleas and issues upon the record, the validity of the charter cannot be inquired into."

4.  " There were two objects that the subscribers, probably had in view; one, the completion of the turnpike road; the other, the vesting of their money in a productive fund, the second object may have been advanced, rather than injured by the contrivance of certifying the ficticious stock."

5.  In saying, "I do not therefore see so plainly, how the defendant was injured or exposed to injury in this transaction; and if he was not, I see no reason he has to complain."

6.   " That if the defendant did accept the charter, knowing the facts alluded to, his mouth would be closed, and no objection on that account would now avail him."

7.  " That the advertisement and proxy are evidence to show his acceptance of the charter.  If he did so, knowing the facts, he is barred in his defence."

8.   Court erred in charging on defendants fourth point, in saying, "such ignorance as is set out in this point, may not be a bar to

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co.)

plaintiff's recovering, if the charter was obtained, the company organised, the work done as intended, and the State has confirmed the charter, waiving all exceptions to these irregularities."

9. The court erred in charging on the third point of defendant, in saying "the commissioner had no power or authority to promise or engage to take payment in work."

The first error assigned, having already been considered, any further remarks in relation to it, are deemed unnecessary. In delivering the opinion of the court on the remaining errors, I propose to confine myself to such general remarks, as may, on this occasion suffice. The defendant complains, that the court erred, when they told the jury, that the validity of the charter could not be inquired into, in this action. This point came before us, and has already been decided in the case reported in 16 *Serg. & Rawle,* 140, where it was expressly declared, that if the charter had been even fraudulently obtained, it could not be declared void, collaterally, in a suit like the present; it could only be vacated by this court, either by *scire facias* to repeal it or to declare it forfeited, or on a writ of *quo warranto,* at the suit of the commonwealth; and so the court below declared the law; there was then no error in this part of the charge. But if, in obtaining the charter, a fraud has been committed on the defendant in this action, by which he has sustained or might sustain an injury, it is an entirely different question, whether the corporation can sustain this suit. The evidence is positive, full, complete and uncontradicted, that the charter was obtained by means of the subscription of three hundred shares of fictitious stock, in order to make up the six hundred shares, required by law before a charter could be granted, and that a deliberate plan was adopted and pursued to obtain the fictitious stock; and thereby obtain a charter and the twenty thousand dollars subscribed by the State. But there is no proof, nor colour of proof, that the defendant knew of the plan or scheme to put down fictitious names for three hundred shares, or ever knew any thing of the execution of the plan, or that it had been carried into effect. It appears that it was suggested and adopted at a meeting of the commissioners, at which it is not pretended, any stockholder, who was not a commissioner, was present. The defendant was not a commissioner. There is no proof that the subscribers to this stock were informed that three hundred shares, together with the commonwealth's subscription of twenty thousand dollars would be sufficient to make the road, the commissioners, to be sure, were so told, but not the stockholders. Can it then be supposed, that if the stockholders had been informed of the scheme, they would ever have agreed to it? Or have we a right to say, they would have assented? For my own part, I cannot think they would. It was a direct injury to every stockholder who had subscribed, for if six hundred shares had been taken, as the law provided, it is

(James M'Conahy v. The Centre and Kishacoquillas Turnpike Road Co.)

evident, that no more than *fifteen* dollars would have been required on each share, whereas by the plan adopted in taking three hundred shares from fictitious subscribers, every real stockholder is called upon to pay *thirty* dollars on each share. I would ask, was it just, was it fair to deal thus with the stockholders. The proof in this cause, I observe, was by one of the commissioners, and he does not state, that the commissioners ever divulged their plan of taking fictitious stock, to the real subscribers, or that any of them knew of it, until after the company was in operation. This, in my opinion, was a fraud on every subscriber, and would excuse him from the payment of his subscription. Let me not be understood, as imputing to the commissioners an intentional fraud, such is not my meaning, I have the pleasure of knowing some of them, and I know, that they are incapable of any such intention. The facts are however, distinctly proved, and nothing is left to inference; it was therefore wrong to refer it to the jury to decide, whether the defendant knew of what was proved to have been done in his absence, and never communicated to him; it was essential for the plaintiffs to establish by evidence the fact of notice, nor could the defendant be called upon, in the first instance to show that there was no notice.

It is contended, that the defendant accepted the charter, and thereby waiving all objections, must pay his subscription money. It is true, a charter was obtained, but the subscribers did not know when or how it was obtained, of the imposition on the government, they knew nothing. They had no direct agency in obtaining it, in fact, the subscribers could not have obtained it, for the commissioners were the persons to certify the necessary facts to the governor, and when this was done, the charter was thereupon granted. I am satisfied, that if a proper application had been made, and the proper mode pursued to repeal this charter, the Supreme Court must have declared it void, as to the State, on account of the imposition practised, or that the State would have been justifiable in refusing to pay their subscription of twenty thousand dollars. The legislature however, having waived their right, the charter is valid as to the State. But, there has been no waiver by the subscribers, who subscribed on the faith of the law, which assured them, that they should contribute with subscribers for six hundred shares, but are afterwards called on to contribute double the sum with half the number of shares. The defendant has not waived any right to resist this imposition so far as he is affected, and he stands discharged, in consequence of the fraud, from his obligation to the company.

The last error assigned is, that the court erred in their answer to the defendant's third point, in saying, that the commissioner had no power or authority to promise or engage to take payment in work. Mr. *Reynolds,* in the presence of one of the commissioners,

(James M'Conahy *v.* The Centre and Kishacoquillas Turnpike Road Co )

after the defendant had refused to subscribe, urged, as a means to prevail on him to subscribe, that he could pay it in black-smith work, and on this assurance, obtained the defendant's subscription. This declaration, made in the presence of the commissioner, and not objected to by him, is to be taken as his declaration, nor is it correct to say, that the law draws a distinction between the commissioner and the corporation, in regard to this promise. I hold the promise to be so far binding, on the corporation, as to prevent it from recovering of the defendant contrary to the terms on which he subscribed. See *Hill* v. *Ely*, 5 *Serg. & Rawle*, 363, and *Miller* v. *Henderson*, 10 *Serg. & Rawle*, 290. The opinion of the court is, that the plaintiff in error has sustained the errors above adverted to.

Judgment reversed, and a *venire facias de novo* awarded.